937 F.2d 625
 1991 A.M.C. 2113, 290 U.S.App.D.C. 307,
60 USLW 2026
 EAGLE-PICHER INDUSTRIES, INC., Appellant,
v.
UNITED STATES of America.
GAF CORPORATION, Appellant,
v.
UNITED STATES of America.
UNR INDUSTRIES, INC., UNARCO Industries, Inc., Appellants,
v.
UNITED STATES of America.
 Nos. 90-5098, 90-5105 and 90-5128.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 11, 1991.
Decided June 25, 1991.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 84-01360, 83-01322 and 87-02521).
 Sidney S. Rosdeitcher, New York City, for appellant GAF Corp., in No. 90-5105.
 Paul G. Gaston, with whom Joe G. Hollingsworth was on the brief, Washington, D.C., for appellants Eagle-Picher Industries, Inc. and UNR Industries, Inc., in Nos. 90-5098 and 90-5128.
 David S. Fishback, Asst. Director, Torts Branch, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and J. Patrick Glynn, Director, Torts Branch, Dept. of Justice, were on the brief, Washington, D.C., for appellee, in Nos. 90-5098, 90-5105 and 90-5128.
 Before WALD, RUTH B. GINSBURG and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 In these consolidated appeals, three manufacturers of asbestos products appeal from the district court's dismissal of their claims against the United States. The manufacturers had sought contribution or indemnification from the United States for costs incurred in the litigation and settlement of actions brought by shipyard workers alleging injury from asbestos products. The district court ruled that it lacked subject-matter jurisdiction to consider claims arising out of injuries to public shipyard employees and, moreover, that certain of the manufacturers' claims were time-barred. For the reasons set forth below, we affirm in part, reverse in part, and remand this matter for further proceedings.
 
 I. BACKGROUND
 A. Factual and Procedural Background
 
 2
 Beginning in the 1930s and continuing throughout World War II, Eagle-Picher Industries, Inc., UNR Industries, Inc. (also known as UNARCO Industries, Inc.), and GAF Corporation (collectively, "manufacturers" or "plaintiffs") supplied asbestos products to shipyards across the country. Since that time, thousands of shipyard workers have developed asbestos-related diseases as a result of exposure to those products and have sued the manufacturers under a variety of legal theories. See generally Special Project, An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation, 36 Vand.L.Rev. 573 (1983) (discussing theories of asbestos-injury liability); Note, Admiralty Jurisdiction: The New Wave in Asbestos Litigation, 13 Balt.L.Rev. 145, 146-47 & nn. 7-26 (1983) (collecting authorities). In litigating and settling these claims, the manufacturers have incurred substantial expenses; underlying the instant appeals are more than 2,700 claims totalling more than $14 million.
 
 
 3
 The manufacturers brought suit against the United States in the District Court for the District of Columbia seeking contribution or indemnification for these costs. The plaintiffs alleged, inter alia, that the asbestos products involved in the shipyard workers' injuries were designed in accordance with government specifications, that the government was aware of the hazards posed by the products as designed, and that the government breached its duty of care both in designing the products and in failing to warn the plaintiffs and the shipyard workers of those hazards. The plaintiffs also alleged that the government failed to exercise due care in its supervision and control of government and contract shipyards by introducing such hazardous products into the workplace and by failing to promulgate health and safety regulations adequate to protect shipyard workers from the resulting hazards.
 
 
 4
 The manufacturers claimed that the district court had jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. Secs. 1346(b), 2671 et seq.; the general admiralty and maritime law of the United States, 28 U.S.C. Sec. 1333; the Suits in Admiralty Act ("SAA"), 46 U.S.C.App. Secs. 741-52; the Public Vessels Act ("PVA"), 46 U.S.C.App. Secs. 781-90; and the Admiralty Jurisdiction Act, 46 U.S.C.App. Sec. 740. See, e.g., GAF Complaint at 4. The government disagreed on all counts and moved to dismiss for lack of subject-matter jurisdiction. The government argued that the court lacked jurisdiction over any claims arising from injuries to public shipyard employees and moved to dismiss all such claims. The government also argued that one plaintiff (UNR Industries) had failed to comply with the timely notice requirements of the FTCA and moved to dismiss the majority of UNR's claims on these grounds as well. The district court granted both of the government's motions. Eagle-Picher Industries, Inc. v. United States, No. 84-1360, Memorandum Opinion ("Mem. op.") (D.D.C. Aug. 4, 1989).
 
 B. Relevant Statutes
 
 5
 This case involves the intricate interaction of several statutes. We begin our discussion with a brief review of the relevant provisions of three of those statutes.
 
 
 6
 The FTCA operates as a limited waiver of sovereign immunity, providing that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. Sec. 2674. The precise application of this "analogous liability" standard lies at the heart of the controversy in this case.
 
 
 7
 The Longshore and Harbor Workers' Compensation Act (the "Longshore Act"), 33 U.S.C. Secs. 901 et seq. (1982), is a workers' compensation scheme governing "injur[ies] occurring upon the navigable waters of the United States." Id. Sec. 903(a). Like most workers' compensation regimes, the Longshore Act includes an exclusivity clause (Sec. 905(a)) which provides that liability under the Act's compensation provisions "shall be exclusive and in place of all other liability of such employer to the employee." Notwithstanding Sec. 905(a), the Act (for all times relevant to this litigation) also provided that "[i]n the event of injury to a person ... by the negligence of a vessel [ ] such person ... may bring an action against such vessel as a third party." Id. Sec. 905(b). Although longshore workers are most often employed by distinct companies (called "stevedores"), in some cases a vessel directly employs its own longshore workers. In such a circumstance, a vessel owner may be immune from suit in its capacity as employer, but liable to a longshore worker in its capacity as vessel owner. Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 529-32, 103 S.Ct. 2541, 2546-48, 76 L.Ed.2d 768 (1983). In 1984, Congress amended Sec. 905(b) to bar such "dual-capacity" actions. See 33 U.S.C. Sec. 905(b) (1988) ("no such action shall be permitted, in whole or in part or directly or indirectly (in any capacity, including as the vessel's owner )" (emphasis supplied)). All of the claims involved in this appeal, however, accrued before the Act was so amended.
 
 
 8
 The Federal Employees' Compensation Act ("FECA"), 5 U.S.C. Secs. 8101 et seq., is a workers' compensation scheme governing civilian employees of the United States. FECA's exclusivity provision, Sec. 8116(c), states that the "liability of the United States ... under this subchapter ... is exclusive and instead of all other liability of the United States." This provision, however, is somewhat less sweeping than an initial reading might suggest. As the Supreme Court concluded in Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 196, 103 S.Ct. 1033, 1037, 74 L.Ed.2d 911 (1983) (citation omitted), Sec. 8116(c) "was intended to govern only the rights of employees, their relatives, and people claiming through or on behalf of them" and did not disturb " 'the rights of unrelated third parties.' " Cf. United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951).
 
 
 9
 II. JURISDICTION UNDER THE FEDERAL TORT CLAIMS ACT:
 
 
 10
 INTERACTION OF THE FTCA, THE LONGSHORE ACT, AND FECA
 
 A. The Parties' Arguments
 
 11
 The manufacturers' argument is straightforward. Pursuant to the analogous-liability standard of the FTCA, they contend, the government is liable if a "private individual under like circumstances" would also be liable. The manufacturers urge that an analogous, private-party defendant would be governed, inter alia,[1] by the Longshore Act and that under Sec. 905(b) of that Act a "dual-capacity" employer (i.e., a vessel owner who directly hired longshore workers) would be liable to an employee for its negligence qua vessel owner. They argue further that a third party who compensates an employee for injuries caused by the dual-capacity employer's negligence would be allowed to recover such compensation from the negligent employer.
 
 
 12
 The government, the plaintiffs maintain, operated in a dual capacity with regard to public employees in public shipyards.[2] The plaintiffs allege that the government acted negligently in its capacity as a vessel owner and that the plaintiffs have since compensated federal employees for injuries resulting from that negligence. Accordingly, the plaintiffs conclude, just as a private vessel owner/stevedore would be liable for a third-party claim, so the government too is liable under the FTCA for a third-party claim.
 
 
 13
 The government's argument is more intricate. The government first states that "[t]he United States is immune to direct tort suit by its employees for any work-related injuries, due to the all-encompassing immunity set forth in [ ] Sec. 8116(c) of the FECA." United States Brief ("U.S.Br.") at 13 (emphasis in original). The government contends that, although a privately employed longshore worker may sue a private vessel owner/stevedore for negligence in its capacity as vessel owner under the Longshore Act's Sec. 905(b), a federal employee could not undertake a similar suit against the federal government.
 
 
 14
 Next, the government urges that, under the FTCA's analogous-liability standard, the comparable "private individual under like circumstances" would be a vessel owner equipped with the government's posited FECA-based immunity against dual-capacity liability. In other words, under the government's analysis, FECA immunizes the government as vessel owner against Longshore Act suits by federal employees, this immunity is a "like circumstance" for purposes of the FTCA, and therefore no FTCA action against the government as vessel owner may be brought by a government employee.
 
 
 15
 However, as the government recognizes, this case involves not a first-party suit by a federal employee against the government qua vessel owner, but rather a third-party action against the government qua vessel owner. Although it might be thought that if the government were immune from suits brought by its employees it must also, correspondingly, be immune from suits brought by third parties and arising from those parties' liability to federal employees, the Supreme Court in Lockheed indicated that this is not so. Lockheed established that FECA's Sec. 8116(c) does not directly bar third-party actions and therefore, in this case, the government could not (consistent with Lockheed ) argue that the government's posited FECA immunity from dual-capacity suit barred not only first-party claims but also third-party claims of the sort now before us.
 
 
 16
 Accordingly, the government urges one further step and argues that "Sec. 905(a) [of the Longshore Act] provides that a private shipyard is immune from third-party tort liability if it is immune from direct tort liability."[3] U.S.Br. at 19. The contours of the government's argument should now be clear: FECA immunizes the government from the first-party, dual-capacity liability established in Sec. 905(b) of the Longshore Act; Sec. 905(a) of the Act renders third-party liability contingent on first-party liability and therefore the government qua vessel owner is immune from third-party liability; and both of these factors constitute "like circumstances" for purposes of the FTCA. From these premises, the government concludes there can be no third-party, dual-capacity actions against the United States based on the claims of federal employees.
 
 
 17
 B. An Alternative Analysis of the Analogous-Liability Standard
 
 
 18
 After reviewing and benefitting from the analyses outlined above as well as those adopted by our sister circuits in similar cases,[4] we adopt a somewhat different approach. We begin with the relevant FTCA provision and ponder the status of a "private individual under like circumstances." The manufacturers suggest that dual-capacity liability under the Longshore Act is a "like circumstance," but this contention is problematic. The Longshore Act covers injuries incurred by private employees and expressly provides that "[n]o compensation shall be payable in respect of the disability or death of an officer, or employee of the United States." 33 U.S.C. Sec. 903(b). It is somewhat counterintuitive then that the Longshore Act, which by its own explicit terms does not reach federal employees, would--when read in conjunction with the FTCA--create a cause of action against the government based on the government's duty to its employees. Cf. Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 673, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977) (rejecting governmental liability as tantamount to " 'judicially admit[ting] at the back door that which has been legislatively turned away at the front door' " (citation omitted)). The plaintiffs' approach would lead us to subject the United States to liability under a statute that, since its inception, has explicitly barred government employees from its coverage.
 
 
 19
 At the same time, the government's suggestion that its FECA immunity is a relevant "circumstance" under the FTCA appears to sweep more broadly than is necessary to decide this case. The government's position would effectively preclude FECA-covered employees from bringing suit against the government under the FTCA.[5] For the reasons set forth below, we find it unnecessary to adopt such a broad holding at this time.
 
 
 20
 We adopt a third position. We conclude that the relevant "circumstance" for purposes of the FTCA analysis is not the employer's immunity from suit (as the government suggests), but rather the limitations on the employee's right to sue under the Longshore Act. Accordingly, for purposes of the FTCA, the posited "private individual under like circumstances" is a vessel owner/stevedore with employees who are not covered by the Longshore Act. Such an employer might be a vessel owner/stevedore whose longshore workers are covered solely by another compensation scheme (as federal employees are covered by FECA) or whose employees work abroad and therefore lack the geographic nexus to the navigable waters of the United States required by the Act. See 33 U.S.C. Sec. 903(a).
 
 
 21
 In this regard, our analysis parallels that of the Third Circuit in Eagle-Picher Industries, Inc. v. United States, 846 F.2d 888 (3d Cir.), cert. denied, 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988). In that case, the Third Circuit employed the FTCA's analogous-liability standard, and focused on the Longshore Act's Sec. 903(b) which "expressly excludes federal employees ... from its coverage." Id. at 893. Because of this exclusion, the court concluded that "Sec. 905(b) of the [Longshore Act] creates no right of action on behalf of federal employees against the United States [and that therefore] the FTCA waiver of immunity is not implicated." Id.; see also In re All Maine Asbestos Litigation (PNS Cases), 772 F.2d 1023, 1029 (1st Cir.1985), cert. denied, 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). In sum, we hold that under the FTCA, a "private individual under like circumstances" would have no liability to its employees under the Longshore Act--and therefore that the United States similarly has no liability under the interplay of the FTCA and the Longshore Act.
 
 
 22
 III. JURISDICTION UNDER THE SUITS IN ADMIRALTY ACT AND THE
 
 PUBLIC VESSELS ACT
 
 23
 Although we reject the plaintiffs' contentions that their claims arise under the FTCA (as read in conjunction with the Longshore Act), the logic of our analysis--as well as the fact that we review a motion to dismiss for lack of subject-matter jurisdiction--leads us to address an alternative basis of jurisdiction pleaded (albeit with little explication) by the plaintiffs.
 
 
 24
 A. The Common Law Claims of Federal Employees
 
 
 25
 As discussed above, the Longshore Act's Sec. 903(b) excludes federal employees from the scope of the Act. However, that section does not bar all causes of action by federal employees against vessel owners. Section 903(b) simply establishes that federal employees are not covered by the Longshore Act; it does not indicate that federal employees have no remedies for Longshore Act-type claims, but rather directs that we look elsewhere for such remedies. As the Ninth Circuit noted:
 
 
 26
 Section 903(b) merely says that the federal government and its employees are not part of the LHWCA scheme. This would preclude dual capacity suits against the government only if section 905(b) actually created the right to sue a vessel owner in tort.... [But] the LHWCA does not create the right to sue a vessel owner for negligence. This right derives from federal common law.... Section 903(b) therefore does not address, and certainly does not preclude, the rights of federal employees to pursue remedies that are available at common law.
 
 
 27
 Bush v. Eagle-Picher Industries, Inc., 927 F.2d 445, 450 n. 8 (9th Cir.1991) (emphasis in original).
 
 
 28
 In short, our analysis, while beginning with the FTCA and proceeding to the Longshore Act, does not end with that Act's Sec. 903(b). Instead, we proceed to examine whether the plaintiffs have a cause of action arising somewhere other than the Longshore Act. Doing so requires a brief review of the origins and evolution of an important line of admiralty cases, viz., the cases involving "triangle suits."
 
 
 29
 In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court held that, at maritime common law, a longshore worker could sue a vessel owner to recover for injuries occasioned by the "unseaworthiness" of a vessel. The vessel owner would be held strictly liable "if the vessel was not 'reasonably fit for her intended service.' " 1A S. Friedell, Benedict on Admiralty Sec. 91 at 5-3 (7th ed. 1991) (quoting Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971)); see generally T. Schoenbaum & A. Yiannopoulous, Admiralty and Maritime Law 632-33 (1984). Burdened by such liability, vessel owners then successfully sought indemnity from stevedores based on an implied warranty of "workmanlike service," which the Supreme Court recognized in Ryan Stevedoring Co. v Pan-Atlantic Steamship Corp., 350 U.S. 124, 133, 76 S.Ct. 232, 237, 100 L.Ed. 133 (1956).
 
 
 30
 [The] result was the famous Ryan triangle: the longshoreman, having collected compensation from the stevedore, sued the shipowner in unseaworthiness and received a large verdict; the shipowner recovered over against the stevedore under Ryan; and the stevedore's only consolation was to have his compensation outlay refunded.
 
 
 31
 2A A. Larson, Workmen's Compensation Law Sec. 72.84 at 14-269 (1990); see also Proudfoot, "The Tar Baby": Maritime Personal-Injury Indemnity Actions, 20 Stan.L.Rev. 423 (1968).
 
 
 32
 Such maritime common law remedies were available to both private and public employees. For example, in Greene v. Vantage Steamship Corp., 466 F.2d 159, 161 (4th Cir.1972), "a longshoreman employed by the United States ... was fatally injured when a hatch board on [a privately-owned vessel] gave way." Invoking Sieracki, the decedent's wife sued the vessel owner, who "then filed a third party action against the stevedore, the United States, alleging that it had breached its implied warranty of workmanlike performance." Id.
 
 
 33
 In 1972, Congress amended the Longshore Act by, inter alia, adding Sec. 905(b), thereby abolishing the Ryan indemnity action and converting the strict-liability unseaworthiness action into a negligence claim. As part of a legislative quid pro quo, Congress substantially enhanced Longshore benefits. Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 267 n. 18, 99 S.Ct. 2753, 2760 n. 18, 61 L.Ed.2d 521 (1979); see also S.Rep. No. 92-1125, 92d Cong., 2d Sess. 9-10 (1972).
 
 
 34
 Section 905(b)--and therefore the abolition of the Sieracki and Ryan causes of actions--however, only reaches persons covered by the Longshore Act. Section 905(b), by its own terms, applies only to "a person covered under th[e Act]" and, as discussed above, Sec. 903(b) indicates that federal employees are not covered by the Act. Stated another way, one corollary of our conclusion that Sec. 903(b) removes federal employees from the coverage of the Longshore Act is that Sec. 905(b) of the Act does not eliminate the Sieracki and Ryan claims of federal employees.
 
 
 35
 The Fifth Circuit reached a similar conclusion in Aparicio v. Swan Lake, 643 F.2d 1109, 1116-18 (5th Cir.1981). In that case, the court found that "there is nothing in the legislative history expressly evidencing a congressional intent to liberate from Sieracki vessel owners and stevedores not subject to LHWCA liability." Id. at 1116. The court suggested that FECA employees "not having received the benefit of the bargain struck by Congress [in the 1972 Longshore amendments] in the form of increased compensation payments ... should not be required to relinquish their Sieracki ... unseaworthiness action." Id. at 1117; see also Cormier v. Oceanic Contractors, Inc., 696 F.2d 1112 (5th Cir.), cert. denied, 464 U.S. 821, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983) (reaching same conclusion for longshore worker employed in United Arab Emirates); United States Lines, Inc. v. United States, 593 F.2d 570, 572 (4th Cir.1979) ("The amendments, relating only to workers covered under the Act, had no direct effect on longshoremen ... who are covered under the FECA."). Two years later, in Lockheed, the Supreme Court fully embraced this mode of reasoning, emphasizing that only "parties who benefit from [a] 'quid pro quo' compromise" should be interpreted as surrendering their rights. Lockheed, 460 U.S. at 196, 103 S.Ct. at 1037.
 
 
 36
 In sum, although the 1972 Longshore amendments eliminated the maritime common law causes of actions recognized in Sieracki and Ryan, it did so only for longshore workers covered by the Longshore Act. Therefore, although federal employees (and third parties whose claims arise from an employee's right) lack an FTCA action against the government based on the Longshore Act, such employees (and derivative third parties) retain their maritime common law claims.
 
 
 37
 B. The Suits in Admiralty Act and the Public Vessels Act
 
 1. The Maritime Nexus Requirement
 
 38
 A Sieracki-type action against the United States qua vessel owner brought by a federal employee (or a third-party action deriving from an employee's claim) would arise under the Suits in Admiralty Act ("SAA") or the Public Vessels Act ("PVA"). The SAA waives the United States' sovereign immunity with respect to "cases where if [the involved] vessel were privately owned or operated ... a proceeding in admiralty could be maintained." 46 U.S.C.App. Sec. 742 (emphasis supplied). The PVA similarly waives the government's immunity and provides that a "libel in personam in admiralty may be brought against the United States ... for damages caused by a public vessel of the United States." 46 U.S.C.App. Sec. 781 (emphasis supplied). Accordingly, the threshold inquiry of our analysis of the manufacturers' maritime common law claims is whether those claims arise in admiralty. See generally Watson, The Suits in Admiralty Act, 17 J.Mar.L. & Com. 175, 182-83 (1986).[6]
 
 
 39
 For almost two centuries the dominant understanding of admiralty jurisdiction in the United States relied exclusively on a "locality" test and "[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, [was] of admiralty cognizance." The Plymouth, 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1866). In Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 255, 268, 93 S.Ct. 493, 498, 504, 34 L.Ed.2d 454 (1972), the Supreme Court noted "serious difficulties with the locality test," and added an additional requirement: that the wrong "bear a significant relationship to traditional maritime activity." This standard was reaffirmed (and its reach clarified) in Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), and most recently in Sisson v. Ruby, --- U.S. ----, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Therefore, in order to state a claim in admiralty, the manufacturers must show both that the alleged torts occurred in a maritime location and that the claims bore a sufficient nexus to maritime activity.
 
 
 40
 In this case, the parties do not dispute that the locality requirement has been satisfied. They do disagree sharply, however, about whether or not the manufacturers' claims arising from injuries to federal shipyard workers demonstrate the required "maritime nexus."[7] At least one court of appeals (the Third Circuit) has addressed this precise question and concluded that a maritime nexus does not exist.[8] See Eagle-Picher Industries Inc., 846 F.2d at 895-97.
 
 
 41
 The Supreme Court's recent decision in Sisson casts some doubt on the Third Circuit's conclusion. In finding a lack of maritime nexus, the Third Circuit relied on the fact that although the injured shipyard worker was engaged in the repair and construction of ships, in working with asbestos he had "skill and training that was 'linked more with the land than with the sea.' " 846 F.2d at 896 (citation omitted); cf. Myhran v. Johns-Manville Corp., 741 F.2d 1119, 1122 (9th Cir.1984); Harville v. Johns-Manville Products Corp., 731 F.2d 775, 785 (11th Cir.1984). Such characterizations, however, give us pause. One could just as easily describe a worker offloading a ship as engaged in the landlubber's trade of cargo hauling and transfer, depict a worker repairing sails as a seamster using the skills and training of a landsman, or characterize a laborer varnishing a vessel's trim as performing a painter's role--one "linked more with the land than with the sea." The Supreme Court counseled against such myopia:
 
 
 42
 [To determine whether there exists] a substantial relationship between the activity giving rise to the incident and traditional maritime activity[,].... the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose. In Executive Jet, for example, the relevant activity was not a plane sinking in Lake Erie, but air travel generally.
 
 
 43
 Sisson, 110 S.Ct. at 2897 (citation omitted) (emphasis supplied). Pursuant to Sisson, the "relevant activity" in this case would seem to be not simply the use of asbestos insulation (as the Third Circuit's analysis indicates), but rather the use of such insulation in an activity essential to the maritime industry.
 
 
 44
 Perhaps fortunately, we need not resolve the issue of whether the asbestos-related injuries of federal shipyard workers establish the required maritime nexus. As discussed more fully in the following section, even assuming arguendo that we were to find that the manufacturers' claims arose in admiralty, the interplay of FECA, the Suits in Admiralty Act, the Public Vessels Act, and maritime common law indicates that federal courts lack jurisdiction over such claims when brought against the United States.
 
 
 45
 2. Interaction of FECA With the SAA and the PVA[9]
 
 
 46
 As an initial matter, "the Federal Employees' Compensation Act ... preclude[s] a suit by [civilian employees of the government] under the Public Vessels Act" or the Suits in Admiralty Act. Johansen v. United States, 343 U.S. 427, 428, 72 S.Ct. 849, 851, 96 L.Ed. 1051 (1952); Patterson v. United States, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed.2d 971 (1959). In Johansen and Patterson, the Court considered claims arising from injuries to civilian employees caused by the negligence and unseaworthiness of government vessels. In an "attempt to fit [the SAA and PVA] as intelligently and fairly as possible, 'into the entire statutory system of remedies against the Government to make a workable, consistent and equitable whole,' " Johansen, 343 U.S. at 432, 72 S.Ct. at 853 (quoting Feres v. United States, 340 U.S. 135, 139, 71 S.Ct. 153, 156, 95 L.Ed. 152 (1950)), the Court concluded that the best reading of the statutes indicated that FECA was the exclusive remedy for civilian employees injured by government vessels.
 
 
 47
 The plaintiffs in this case, of course, are not federal employees, but rather third parties seeking to recover for compensation paid to federal employees. Although Johansen and Patterson were decided before Congress amended FECA to add Sec. 8116(c), those decisions must be interpreted in light of Lockheed's holding that FECA's exclusivity provision, while directly barring first-party actions, does not directly bar third-party actions. Reading Johansen and Patterson in this way, we conclude that although FECA precludes first-party actions against the government under the SAA and the PVA, it does not directly bar third-party claims under those Acts. Cf. Lockheed, 460 U.S. at 197 & n. 8, 103 S.Ct. at 1038 & n. 8. Instead, to determine the availability of such actions, we must look to the "underlying substantive" law. See id. Although they fail to articulate a precise theory of recovery, the plaintiffs characterize their claims as being for "contribution or indemnification." As the substantive law of contribution and indemnification raise distinct legal questions we consider each in turn.
 
 
 48
 a. Contribution
 
 
 49
 Although general common law does not allow for contribution between joint tortfeasors, see Prosser, The Law of Torts Sec. 50 (4th ed. 1971), maritime common law has long recognized a rule of contribution.[10] See, e.g., The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91 (1882); see generally Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Cal.R.Rev. 304 (1957).
 
 
 50
 However, the Supreme Court has recognized an exception to this maritime rule. The exception has its roots in Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), in which the Court indicated that the maritime common law rule of contribution did not apply in noncollision cases. However, in Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), the Court clarified that "Halcyon stands for a more limited rule than the absolute bar against contribution in noncollision cases." Id. at 111, 94 S.Ct. at 2177. In Cooper Stevedoring, the Court considered a noncollision case involving a stevedore, an injured longshore worker, a vessel owner, and a fourth party. The district court found that the latter two were jointly negligent and divided liability between them. The Court ruled that Halcyon only bars contribution when a party is "entitled to the protective mantle of [a statutory] limitation-of-liability provision." Id. at 115, 94 S.Ct. at 2179. As the fourth party lacked such an immunity, the Court affirmed the award of contribution. Stated in simplest terms, the Court's holding in Cooper was familiar: contribution is premised on joint tortfeasance; Sec. 905(a) establishes that the stevedore cannot be a tortfeasor (vis-a-vis its longshore workers); therefore there can be no contribution action by a third party against the stevedore. In short, Halcyon and Cooper Stevedoring established that the maritime common law does not allow contribution against a party who holds a statutory immunity from first-party liability.[11]
 
 
 51
 This rule controls the case before us. Johansen and Patterson have interpreted the SAA and the PVA to preclude first-party suits by federal employees against the government qua vessel owner. Cooper Stevedoring teaches that under maritime common law such a statutory immunity from first-party liability shields the government (qua vessel owner) as well from third-party contribution actions. In short, the combined significance of the SAA, the PVA, and maritime common law is to preclude contribution actions arising from the duty owed by the government qua vessel owner to federal shipyard employees.
 
 
 52
 b. Indemnification
 
 
 53
 Contribution and indemnification differ in several critical ways. First, and most practically, while contribution provides for a proportionate allocation of liability between joint tortfeasors, indemnity "shifts the entire loss from one tortfeasor who has been compelled to pay it to ... another who should bear it instead." Prosser, supra, Sec. 51 at 310; see also Gorman, Indemnity and Contribution under Maritime Law, 55 Tul.L.Rev. 1165, 1166 (1981). More importantly for our purposes, the two concepts have different theoretical origins. Contribution sounds primarily in tort and is based on the duty of each tortfeasor to the injured party (in this case the shipyard workers). Indemnity, on the other hand, sounds in contract and is founded not on either party's obligation to the victim, but on the indemnitor's obligation to the indemnitee (distinct from their coincident obligations to the victim).
 
 
 54
 Of the several varieties of indemnification, two are implicated in this case.[12] The first is implied-contractual indemnity, recognized in the maritime context in Ryan, in which the Supreme Court held that a vessel owner had an indemnity claim against a stevedore based on the existence of an implied warranty of the latter's "workmanlike performance." Although privity of contract between the indemnitor and indemnitee is not necessary, see Waterman Steamship Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 424, 81 S.Ct. 200, 202, 5 L.Ed.2d 169 (1960), implied-contractual indemnity remains premised on an independent duty of the indemnitor to the indemnitee.
 
 
 55
 In this case, the manufacturers assert numerous causes of action: "negligent design [of] asbestos-containing insulation," "negligent failure to implement [ ] health [ ] standards," "negligent failure to exercise reasonable care in [ ] the construction and repair of naval vessels," and "negligent failure to warn [shipyard workers]." See, e.g., Eagle-Picher Complaint at 11-17. These claims, however, are all premised on the government's duty to shipyard workers; the manufacturers have failed to specify any governmental duty to the manufacturers that would give rise to their indemnity claims. Read most generously, the complaints appear to suggest that indemnity against the government is based on the government's (allegedly negligent) use of products purchased from the manufacturers. Although the manufacturers' duty to the government as purchaser is well established under product liability law, we doubt whether the reverse duty also exists. The manufacturers are effectively asking us "to hold a user liable to a manufacturer for the former's negligent use of the latter's defective product." Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 723 (2d Cir.1978). This, we (like Judge Friendly in Zapico ) decline to do. As one commentator asked: "When a purchaser buys a product, does he make an implied contract with the manufacturer to use the goods in such a way as not to bring liability upon the manufacturer?" 2B A. Larson, supra, Sec. 76.84 at 14-871. To ask that question is to answer it.
 
 
 56
 In addition to the foregoing causes of action, one plaintiff, UNR Industries, asserts a different implied-contractual indemnity theory. UNR alleges that "the United States sold or supplied raw asbestos to UNR which was used in the production of insulation products supplied by UNR to government [ ] shipyards" and that the government "owed [and breached] a duty to UNR [ ] to provide adequate information and warnings [about the] hazards" of asbestos.[13] UNR Complaint at 40-41. Even assuming arguendo that the government's sale of raw asbestos created an independent duty from the government to UNR, any posited indemnity derived from that relationship would at very most extend only to UNR's liability to its own employees injured in the manufacture of asbestos products. It would, however, be unreasonable to stretch that indemnity to encompass injuries derived from the government's subsequent use of finished products that the government purchased back from UNR. In effect, the government operated in (yet another) dual capacity here: at least with respect to UNR, it served both as a seller of raw asbestos and as a vessel owner who used UNR's finished products. The mere identity of the "United States" as a party does not merge these two distinct roles and does not mean that a duty created by the first relationship can be projected onto the second. In short, under both scenarios presented in the complaints the manufacturers have failed to allege an independent duty from the government to themselves and thus have failed to establish the analytical prerequisite for an implied-contractual indemnity action.
 
 
 57
 This case also implicates "restitution indemnity," under which "there may be indemnity in favor of one who was under only a secondary duty where another was primarily responsible." Prosser, supra, Sec. 51 at 312; see also Hillier v. Southern Towing Co., 714 F.2d 714, 719-21 (7th Cir.1983), cert. denied, 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 966 (1985). Such indemnity hinges on a demonstration of the "active" negligence of the indemnitor and the "passive" negligence of the indemnitee. One cause of action alleged by plaintiff GAF Corporation seems to rely on this theory. GAF's complaint alleges that the government maintained an unsafe business premise and because "the gravity of the United States' active fault" in doing so "was far greater than any passive fault on the part of GAF ... GAF is entitled to indemnity." GAF Complaint at 20.
 
 
 58
 Although GAF's argument has some initial appeal, it is based on an unsound premise. As GAF's contentions themselves make clear, restitution indemnity is not an indemnity theory at all, but rather a contribution theory: GAF contends that "the United States had a nondelegable duty ... to business invitees and other entrants onto the[ ] premises" "to inspect and make safe the[ ] premises." Id.; see generally Gorman, supra, at 1172 (discussing restitution indemnity as a form of contribution). Accordingly, GAF's claim of restitution indemnity does not derive from the government's independent duty to GAF, but rather from the two parties' concurrent obligations to shipyard workers. Declining any invitation to a label-based formalism, we recognize GAF's "indemnity" claim as a claim for contribution--one, as demonstrated above, that is barred by statutory and common law.
 
 C. Summary
 
 59
 In summary, we hold that although the Longshore Act's Sec. 903(b) precludes federal employees from bringing claims under that Act (either standing alone or as read with the FTCA), the Act (as amended) leaves undisturbed the maritime common law claims of federal employees against vessel owners. We also find, however, that, pursuant to the Supreme Court's decisions in Johansen and Patterson, such claims cannot be brought against the government as vessel owner under the Suits in Admiralty Act or the Public Vessels Act.[14] Moreover, while Johansen and Patterson preclude first-party suits against the government as vessel owner, maritime common law indicates that the manufacturers have not established the existence of a third-party cause of action (for either contribution or indemnity).[15] As the existence of such a claim is a prerequisite to jurisdiction under the Suits in Admiralty Act and the Public Vessels Act, the district court did not have jurisdiction to entertain the manufacturers' third-party, maritime common law action against the United States as vessel owner. We therefore agree with the district court that the manufacturers' claims based solely on federal law should be dismissed for lack of subject-matter jurisdiction.[16]
 
 IV. FTCA CLAIMS BASED ON STATE LAW
 
 60
 In addition to FTCA claims arising from federal law (the Longshore Act and maritime common law), the manufacturers also set forth FTCA claims arising from state law.[17] In many situations, a private vessel owner/stevedore is subject not only to the provisions of the Longshore Act, but also to governing state law (state workers' compensation law or state tort law). Cf. Sun Ship Inc. v. Pennsylvania, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980) (holding that coverage of the Longshore Act and state workers' compensation law is overlapping and concurrent). The manufacturers argue that, just as a private dual-capacity employer may be liable to injured employees under both federal and state law, so the United States when serving in a dual capacity may be liable (via the FTCA) under both bodies of law. Therefore, the manufacturers conclude, even if FTCA claims based on the Longshore Act (or maritime common law) are barred, the government may still be liable for FTCA causes of actions based on state law.
 
 
 61
 The district court rejected the manufacturers' state law-based claims and stated: "Because this Court has determined that the LHWCA bars this third-party tort suit, its holding is not grounded upon the state laws involved in the public shipyards covered by the instant complaints." Mem. op. at 29. The government embraces the district court's ruling, interpreting that ruling as holding that the Longshore Act preempts any state law-based claim creating governmental liability. The government argues that the Act's exclusivity provision (Sec. 905(a)) bars third-party suits against a Longshore Act employer and that "any state law rule permitting third-party tort suits notwithstanding [the employer's] immunity to underlying suit" conflicts with, and is therefore preempted by, Sec. 905(a). U.S.Br. at 38. Accordingly, the government maintains that because Sec. 905(a) protects the United States from the manufacturers' third-party FTCA claims under the Longshore Act, it also preempts the manufacturers' third-party FTCA claims arising from state law.
 
 
 62
 The primary shortcoming of the government's argument should be self-evident from our discussion in Part II.B. As we concluded above, the Longshore Act simply does not apply to federal employees, either directly or indirectly through the FTCA; Sec. 903(b) of the Longshore Act expressly excludes federal employees from the scope of the Act. If the Act does not reach federal employees and create an FTCA cause of action for those employees, then it cannot reach those employees for the sole purpose of barring their state law-based FTCA claims.
 
 
 63
 Moreover, even if federal employees were covered by the Longshore Act, the government's reading of Sec. 905(a) is too broad. That section provides that "[t]he liability of an employer prescribed in section 904 ... shall be exclusive." 33 U.S.C. Sec. 905(a) (emphasis supplied). Thus any preemptive effect of the Longshore Act would reach only to the government's liability as an employer, not its liability as a vessel owner--and it is upon this latter capacity that the manufacturers base their claims.
 
 
 64
 In short, we conclude that the Longshore Act's exclusivity provision does not preempt the manufacturers' state law-based FTCA claims and to this extent we reverse the decision of the district court. Moreover, as the district court did not directly address the manufacturers' state law-based claims, see Mem. op. at 29-30, and because we believe that the district court is better positioned to make an initial determination concerning the manufacturers' claims under the various state laws involved, we remand this case to the district court for further proceedings.
 
 V. PARTIAL DISMISSAL OF UNR'S COMPLAINT
 
 65
 The district court also dismissed in part the complaint of UNR Industries for failure to meet a mandatory time prescription. The government contended, and the district court agreed, that 1,374 of the 1,422 claims incorporated in UNR's complaint seeking contribution or indemnity were time-barred. We agree with the analysis of the district court and, accordingly, affirm the partial dismissal.
 
 A. Background
 
 66
 Section 2401(b) of the Federal Tort Claims Act provides that a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. Sec. 2401(b) (emphasis supplied). As UNR presented its claim to the relevant federal agencies on February 15, 1984, such a filing could (in most circumstances) include only claims that accrued after February 15, 1982.[18] However, more than 90% of the claims underlying UNR's filing accrued before February 15, 1982.
 
 
 67
 Despite this apparent infirmity, UNR contended that its filing of a voluntary petition for bankruptcy on July 29, 1982, tolled the FTCA statute of limitations for two years. Accordingly, UNR argued, its February 15, 1984 claim, which was filed during the tolling period, properly included all claims that had accrued after July 29, 1980 (two years before UNR's bankruptcy petition tolled the FTCA statute of limitations). The district court disagreed. The court ruled that UNR's reliance on Sec. 108(a) of the Bankruptcy Code was misplaced and that the relevant section of the Code was Sec. 108(b), which provided only a 60-day tolling period. This tolling period only ensured that claims that would have expired on July 29, 1982 (the date of UNR's bankruptcy petition) could be filed 60 days "late"--that is, as late as September 27, 1982. The court concluded that because UNR did not file its administrative claim until 1984, well after the 60-day period had run, UNR had failed to meet the FTCA's presentment requirement with regard to most of its claims. Therefore, the court held, the only timely claims underlying UNR's action for contribution or indemnity were the 48 claims that accrued in the two years before the February 15, 1984 presentment. See Mem. op. at 10-13.
 
 B. Analysis
 
 68
 Section 108(a) of the Bankruptcy Code provides, in relevant part:
 
 
 69
 If applicable nonbankruptcy law ... fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the [bankruptcy] petition, the trustee may commence such action only before the later of--
 
 
 70
 (1) the end of such period ...; or
 
 
 71
 (2) two years after the order for relief.
 
 
 72
 11 U.S.C. Sec. 108(a) (emphasis supplied). In contrast, Sec. 108(b) of the Code provides:
 
 
 73
 [I]f applicable nonbankruptcy law ... fixes a period within which the debtor ... may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of--
 
 
 74
 (1) the end of such period ...; or
 
 
 75
 (2) 60 days after the order for relief.
 
 
 76
 11 U.S.C. Sec. 108(b) (emphasis supplied). In simplest terms, the question raised by UNR's appeal is whether the presentment of an administrative claim as required by the FTCA is an "action" under Sec. 108(a) or a "notice or proof of claim or loss" under Sec. 108(b).
 
 
 77
 We begin our analysis with the language and structure of the relevant statutes. First, we observe that both the Bankruptcy Code and the FTCA distinguish between "an action" and "a claim." Compare 11 U.S.C. Sec. 108(a)-(b) with 28 U.S.C. Sec. 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing ... within two years after such claim accrues or unless action is begun within six months after ... notice of final denial of the claim...."). Although such labels are not always determinative, the structure of the two statutes reflects a similar distinction. Both statutes indicate that the prosecution of an "action" is a more substantial and involved undertaking than the filing of a "claim": the Bankruptcy Code allows a longer tolling period for "commenc[ing] an action" than for "fil[ing a] claim" and the FTCA provides that the presentment of a claim is both a logical and a temporal antecedent to the prosecution of any tort "action." See generally GAF Corp. v. United States, 818 F.2d 901 (D.C.Cir.1987) (holding that presentment is a jurisdictional prerequisite to an FTCA action). In light of such parallel structures, we agree with the district court that the FTCA presentment requirement should be considered a "notice or proof of claim" under Sec. 108(b), rather than an "action" under Sec. 108(a).
 
 
 78
 This conclusion is reinforced by an examination of the purposes of the presentment requirement. As we discussed at some length in GAF Corp., 818 F.2d at 917-19, Congress, in enacting the presentment requirement, sought " 'to avoid unnecessary litigation [and] to expedite fair settlement of tort claims asserted against the United States.' " Id. at 917 (quoting S.Rep. No. 1327, 89th Cong. 2d Sess. 2 (1966)), U.S.Code Cong. & Admin.News 1966, p. 2515. Accordingly, as the district court concluded, " 'Congress understood these claims presentation statutes as requiring only minimal notice.' " Mem. op at 11 (quoting Warren v. Department of Interior, 724 F.2d 776, 779 (9th Cir.1984)); cf. Tarpeh-Doe v. United States, 904 F.2d 719 (D.C.Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991) (holding that an FTCA-type administrative-claim process was not subject to constitutional procedural due process limitations). The Bankruptcy Code's Sec. 108(b)--which speaks of the "fil[ing of a] pleading [or the] perform[ance of] any similar act"--encompasses such "minimal notice" as implicated in presentment of an FTCA claim.[19]
 
 
 79
 UNR contends that the district court's holding would limit a debtor in bankruptcy to 60 days to file an FTCA claim, even though the same debtor would have two years to file a tort claim against a nongovernmental tortfeasor, and that such a double standard is unsupported by law. We disagree. Because presentment requires only "minimal notice," the initiation of a tort claim against the government is far less costly and far easier than the initiation of an action against a nongovernmental tortfeasor. Given this lesser burden on FTCA claimants it is neither unfair nor inappropriate for Sec. 108(b)'s shorter tolling period to apply to FTCA tort claims while Sec. 108(a)'s two-year period applies to all nongovernmental tort actions.
 
 
 80
 For these reasons we agree with the district court that Bankruptcy Code Sec. 108(b) governs the tolling of the FTCA presentment requirement and that UNR failed to meet that requirement with regard to 1,374 of its 1,422 claims. Accordingly, we affirm the district court's partial dismissal of UNR's complaint as time-barred.
 
 VI. SUMMARY
 
 81
 We summarize our several conclusions. First, we find that, pursuant to the analogous-liability standard of the Federal Tort Claims Act, the substantive federal law governing third-party, dual-capacity claims arising from the duty of the United States to federal shipyard employees is not the Longshore Act, but maritime common law. Second, assuming arguendo that the manufacturers' claims demonstrate the requisite maritime nexus, we find that maritime common law does not recognize a third-party action for contribution or indemnity for costs incurred in compensating such injuries and that therefore a federal court does not have jurisdiction over such an action under either the Suits in Admiralty Act or the Public Vessels Act. Therefore, we conclude that the district court properly dismissed, for lack of subject-matter jurisdiction, the claims raised by the manufacturers that were based solely on federal law.
 
 
 82
 Moreover, because the Longshore Act does not govern the compensation claims of federal employees against the federal government, we also find that the district court erred in concluding that the Longshore Act preempted FTCA actions based on state tort law. We remand this case to the district court for further proceedings to determine the availability of such FTCA actions under the relevant state laws as applied to the government as vessel owner/stevedore. Finally, we affirm the district court's partial dismissal of UNR's complaint as time-barred for failure to present an administrative claim within the statutorily prescribed period.
 
 
 83
 It is so ordered.
 
 
 
 [1]
 The plaintiffs also contend that an analogous private dual-capacity employer would be subject to state workers' compensation law and state tort law; claims arising under the interaction of the FTCA and such state laws are discussed below. See Part IV infra
 
 
 [2]
 We do not have before us any claims arising from injuries to privately employed longshore workers who worked on government-owned vessels, or from injuries to federally employed longshore workers who worked on privately owned vessels
 
 
 [3]
 The government's interpretation of Sec. 905(a) as barring third-party suits against persons who are immune from first-party suits is in some tension with the Supreme Court's decision in Lockheed, supra. In ruling that FECA's Sec. 8116(c) did not directly bar suits by unrelated third parties, the Lockheed Court relied heavily on its analysis of the Longshore Act's Sec. 905(a) (then Sec. 905), which it characterized as "essentially the same" as Sec. 8116(c). Lockheed, 460 U.S. at 194, 103 S.Ct. at 1036. This reliance, as well as the Court's interpretive methodology, suggest that--contrary to the government's contention--Sec. 905(a) does not directly affect third-party rights. But cf. Ketchum v. Gulf Oil Corp., 798 F.2d 159, 161-63 & n. 5 (5th Cir.1986) (indicating that where there is no first-party liability under the Longshore Act, there is no third-party liability)
 
 
 [4]
 See, e.g., Bush v. Eagle-Picher Industries, Inc., 927 F.2d 445 (9th Cir.1991); Eagle-Picher Industries, Inc. v. United States, 846 F.2d 888 (3d Cir.), cert. denied, 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988)
 
 
 [5]
 In general, "[a]n employer may become a third person, vulnerable to tort suit by an employee, if--and only if--he possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person." 2A A. Larson, Workmen's Compensation Law Sec. 72.81 at 14-229 (1990). The vessel owner/stevedore relationship would appear to meet this requirement for dual capacity; it was identified first at common law, see Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), later codified by Congress in the Longshore Amendments of 1972, and recognized by the Supreme Court in Jones & Laughlin Steel Corp., supra. A finding that dual capacity did not exist in this case would effectively preclude the recognition of dual-capacity liability under FECA and would therefore bar tort actions against the government brought by FECA-covered employees
 
 
 [6]
 The FTCA does not reach "[a]ny claim for which a remedy is provided by [the SAA or the PVA], relating to claims or suits in admiralty against the United States." 28 U.S.C. Sec. 2680(d)
 
 
 [7]
 The parties' initial difference concerns the appropriate test for determining the presence of a maritime nexus in asbestos-injury cases; this remains an unsettled question of law. Most circuits addressing this question have employed a test first set forth in Kelly v. Smith, 485 F.2d 520, 525 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). See Oman v. Johns-Manville Corp., 764 F.2d 224 (4th Cir.) (en banc ) (applying Kelly test), cert. denied, 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985); Harville v. Johns-Manville Products Corp., 731 F.2d 775 (11th Cir.1984) (same). However, the Supreme Court has not indicated with precision the appropriate test. See Sisson, 110 S.Ct. at 2897 n. 4
 
 
 [8]
 Several other circuits have reached this question in reviewing claims against private vessel owners. In doing so, those courts have relied heavily on concerns that "exercise of admiralty jurisdiction may preempt state regulation of matters traditionally committed to local resolution." Woessner v. Johns-Manville Sales Corp., 757 F.2d 634, 648 (5th Cir.1985); see also Harville, 731 F.2d at 786. Such federalism concerns, while well-rooted in Executive Jet, see 409 U.S. at 273, 93 S.Ct. at 506, are substantially less compelling in this case. The federal government is subject to liability only upon its own waiver and in general only in federal court. Thus there is no risk that creation of governmental liability to federal employees under federal common law would preempt a traditional province of state regulation
 
 
 [9]
 The parties did not directly brief to this court the issues of jurisdiction under the SAA and the PVA, or the subsequent issues of contribution and indemnification under maritime common law. We reach those issues because our analysis of the relevance of the Longshore Act and the FTCA leads us ineluctably to those issues. If a party finds that this section of our opinion suffers as a result of a lack of party presentation, we invite it to bring any flaws to our attention during the forty-five day period before the mandate in this case issues
 
 
 [10]
 The divergence of general and maritime common law is sometimes explained by the latter's origins in civil law. See G. Gilmore & C. Black, The Law of Admiralty 7-8 (2d ed. 1975)
 
 
 [11]
 Collision cases are treated differently. In Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963), a federal employee was injured in the collision between a government vessel and a private vessel. The employee recovered in tort from the private vessel and the Supreme Court allowed the private vessel to recover from the government under the traditional rule of moiety--that each party in a maritime collision pay half of the total damages. See generally Staring, supra, at 305-11. Collision claims--although nominally "contribution" cases--resemble indemnity cases in that liability derives not from the duty of the liable vessel to the crewmember, but of that vessel to all other vessels in the vicinity
 
 
 [12]
 Indemnity may also be based on an express contractual obligation. In this case, there is no suggestion of such a contractual provision
 
 
 [13]
 Plaintiff GAF Corporation makes a similar claim, alleging that "The United States induced GAF into developing and producing [asbestos products] ... [and that w]ithout [such] assistance and encouragement to develop and produce this thermal insulation for naval vessels, GAF might never have produced such a product." GAF Complaint at 22. Although phrased somewhat differently, this claim bears the same flaws as UNR's purchase-based claim
 
 
 [14]
 We therefore rely on a much narrower ground in finding no first-party, dual-capacity governmental liability than that suggested by the government (and discussed in Part II.A supra). While the government in effect suggests that FECA trumps the FTCA (and the Longshore Act's Sec. 905(b)), our analysis (having rejected the applicability of the Longshore Act) turns more precisely on the relationships between FECA and the SAA and the PVA
 
 
 [15]
 Here again our resolution is narrower than that urged by the government. As discussed in Part II.A supra, the government contends that the Longshore Act's Sec. 905(a) renders third-party liability contingent upon first-party liability; we rely instead on the narrower, maritime common law grounds discussed above
 
 
 [16]
 As the foregoing discussion suggests, the reticulated scheme of federal law implicated by these claims comprises a seamless web. Whether the manufacturers state their federal law claims as arising under the FTCA and the Longshore Act, FECA, the SAA, the PVA, or maritime common law, the result is the same: no jurisdiction
 
 
 [17]
 The manufacturers invoked the laws of six states: California, Florida, Hawaii, New York, Massachusetts, and Pennsylvania
 
 
 [18]
 We join the district court in assuming that UNR's claim for contribution or indemnity "accrued" when the underlying personal injury action was settled
 
 
 [19]
 Section 108(b) was included in the Code "so that the trustee could take the necessary steps to preserve for the estate rights which might otherwise be barred." 1 L. King, Collier Bankruptcy Manual p 108.03 at 108-6 (3d ed. 1991); see also H.R.Rep. No. 595, 95th Cong., 1st Sess. 318 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6275